**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,**

v.

**NORTH AMERICAN COAL CORP., Employer,**

**and**

**Kenneth M. Truitt, Claimant, Respondents.**

No. 79–2127.

United States Court of Appeals, Third Circuit.

Argued Feb. 22, 1980.

Decided June 30, 1980.

Carin Ann Clauss, Sol. of Labor, Laurie M. Streeter, Associate Sol., Judith E. Wolf, Co-Counsel, Washington, D. C., for Black Lung Benefits, John S. Lopatto, III (argued), Atty., U. S. Dept. of Labor, Washington, D. C., for petitioner, Director, Office of Workers' Compensation Programs.

David J. Millstone (argued), Maria J. Codinach, Squire, Sanders & Dempsey, Cleveland, Ohio, for respondent, North American Coal Corp.

Joseph N. Mack, Mack & Bonya, Indiana, Pa., for respondent, Kenneth M. Truitt.

Before ROSENN and HIGGINBOTHAM, Circuit Judges, and LAYTON,* District Judge.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

In this case we are asked to construe provisions of Title IV of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 901 et seq. (1976) (amended 1978) (the Act).[1] These provisions make mine operators liable for the total disability of their employees due to Black Lung disease which arose *during their employment.* Because we conclude that the only argument raised by the petitioners in this appeal was not presented to or considered below by the Benefits Review Board (the Board), we will dismiss the appeal.

### I

### ARGUMENTS RAISED BELOW

The Director, Office of Workers' Compensation Programs, United States Department of Labor (the Director) sued North American Coal Corporation (North American) for payment of disability benefits to North American's former employee, Kenneth Truitt. The Board held that North American was not liable under the Act, thereby making the Black Lung Disability Trust Fund (the Fund) responsible for Truitt's benefits. The Board reasoned that Truitt's disability could not have arisen while he worked for North American because he was irrebuttably presumed under a provision of the Act to be *totally* disabled *before* he began working for it. In this court, the Director, who lost below, has responded to this argument by offering an interpretation of the relevant provisions not raised before the Board or the Hearing Officer. We will review in some detail the procedural history of this case in order to illuminate the Director's change in strategic position and then consider his specific contention that he raised these arguments below.

Truitt originally applied to the Director for disability benefits on October 29, 1974.[2] The Director preliminarily determined that Truitt was eligible for benefits for total disability resulting from "complicated pneumoconiosis," the most severe stage of Black Lung disease under the classification system established under the program. *See* 30 U.S.C. § 921(c)(3) (1976). He also identified North American as the employer liable for payment of Truitt's claim pursuant to the Act and its administrative regulations.

These provisions provide for disability benefits for miners "totally disabled" by pneumoconiosis. A miner is totally disabled "when pneumoconiosis prevents him from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in

---

* Honorable Caleb R. Layton, III, Senior United States District Judge for the District of Delaware, sitting by designation.

1. Title IV of the 1969 Act, Pub.L. 91–173, 83 Stat. 792 (1969), was amended by the Black Lung Benefits Act of 1972, Pub.L. 92–303, 86 Stat. 150 (1972); and the Black Lung Benefits Reform Act of 1977, Pub.L. 95–239, 92 Stat. 95

(1978). The 1978 Amendments are not material to this appeal because the petitioner's claim under the Act was brought in 1974. Unless otherwise noted, we will refer to the statute and regulations as they existed at that time.

2. Truitt retired from North American on September 20, 1974. App., at 19.

which he previously engaged with some regularity and over a substantial period of time." 30 U.S.C. § 902(f) (1976) (amended 1978).[3] Normally, the determination of whether a miner is totally disabled from the disease requires a factual inquiry into the effects of the disease. In cases where the miner is suffering from "complicated pneumoconiosis," however, the Act establishes an "irrebuttable presumption" under Section 921(c)(3) (1976) that he is totally disabled and deserving of benefits, regardless of whether he continues to work.[4] *See Usery v. Turner Elkhorn*, 428 U.S. 1, 23–24, 96 S.Ct. 2882, 2896, 49 L.Ed.2d 752 (1976) (upholding constitutionality of presumption).

The Act and its regulations also identify the employer liable for payment of these benefits, defined as the "responsible operator." The operator "with whom the miner had the most recent periods of cumulative employment of not less than one year . . shall, if financially responsible, be deemed to be the responsible operator." 20 C.F.R. § 725.311(c)(1) (1974).[5] The disability must have arisen during the miner's employment for the operator, however, because the Act provides that in a case such as this

> no benefit will be payable by any operator on account of death or total disability due to pneumoconiosis *which did not arise, at least in part, out of employment in a mine during the period when it was operated by such operator.*

30 U.S.C. § 932(c) (1976) (amended 1978) (emphasis added).[6] North American challenged its responsibility to Truitt under these provisions and requested a hearing.

### A. The Hearing

On July 7, 1977, the Director, the claimant, and North American appeared before a Hearing Officer of the Department of Labor. At the beginning of the hearing the parties identified the main issues as whether Truitt was currently afflicted with "complicated pneumoconiosis" rather than a less severe form of the disease; and whether, as a factual matter, North American had contributed to his disability. The Director introduced evidence of medical reports of x-rays taken during 1975 indicating that Truitt suffered from complicated pneumoconiosis. The Director also submitted a letter of September 15, 1972 reporting that a prior x-ray of Truitt had revealed complicated pneumoconiosis.

Although the Director only introduced this letter to support his contention regarding the severity of Truitt's current illness, North American's counsel recognized the possibility that the early date of the x-ray might also absolve North American from liability for the disease. He suggested when the letter was introduced that the x-ray was taken on February 13, 1970, ten days before Truitt began working for North American. Under his view, Truitt was thus irrebuttably presumed to be totally disabled before he began working for it, and his

---

**3.** The 1978 amendments merely add "when pneumoconiosis prevents him *or her* . . . in which he *or she* . . . ." Pub.L. 95–239 § 2(c).

**4.** 30 U.S.C. § 921(c)(3) (1976) provides:

(3) if a miner is suffering or suffered from a chronic dust disease of the lung which (A) when diagnosed by chest roentgenogram, yields one or more large opacities (greater than one centimeter in diameter) and would be classified in category A, B or C in the International Classification of Radiographs of the Pneumoconioses by the International Labor Organization, (B) when diagnosed by biopsy or autopsy, yields massive lesions in the lung, or (C) when diagnosis is made by other means, would be a condition which could reasonably be expected to yield results described in clause (A) or (B) if diagnosis had

been made in the manner prescribed in clause (A) or (B), then *there shall be an irrebuttable presumption that he is totally disabled due to pneumoconiosis or that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis, as the case may be.* (emphasis added).

**5.** The criteria for identifying the responsible operator after the 1978 amendments are contained in 20 C.F.R. § 725.493 (1979).

**6.** This provision was amended in 1978 to provide that "no benefit shall be payable . . . in a mine during a period *after December 31, 1969* when it was operated by such operator." Pub.L. 95–239, § 7(c).

disability could not have "arise[n], at least in part" while he worked for them. North American moved for a dismissal on this ground at the completion of the Director's case. Counsel for the Director did not challenge this legal interpretation at the hearing, although he did question whether the x-ray had in fact been taken on February 13, 1970. Indeed, he even conceded at the hearing, subject to further review, that he thought "there would be some merit in [North American's] position." Transcript of July 7 Hearing, *reprinted in* App., at 118.

Nevertheless, the Hearing Officer initially ruled that Truitt's affliction with complicated pneumoconiosis *before* he worked for North American would not, as a matter of law, preclude North American's liability. He denied the motion to dismiss, noting that

> the condition of pneumoconiosis is progressive and can get worse even though a person has complicated pneumoconiosis[. I]t's not a category that's [a] medically sealed entity and the Claimant's condition can be contributed to significantly by employment even subsequent to the time that he had complicated pneumoconiosis.

*Id.* at 122–23. Thus, North American submitted its evidence on the severity of Truitt's illness and its possible contribution to it. The Hearing Officer then ruled that Truitt had complicated pneumoconiosis. He left the record open, however, for North American to determine the date of the x-ray referred to in the letter and to produce further reports on the dust levels at North American.

On August 6, 1977, North American informed the Hearing Officer that the February 13, 1970 x-ray had been discovered and had been read as indicating complicated pneumoconiosis.[7] This evidence proved critical, for on September 28, 1977, the Hearing Officer, apparently rejecting his prior legal analysis, decided that North American could not be the "responsible operator." He

adopted the reasoning advanced by North American and held that the February 13, 1970 x-ray established an irrebuttable presumption that Truitt was totally disabled.

> Since the Claimant was fully entitled to benefits at the time he went to work for the Employer, and since he would be fully entitled to benefits if he had never worked for the Employer, I will not find that the Claimants employment by the Employer contributed to a disability which was, as a matter of law, already total at the time he was employed.

*Truitt v. North American Coal Corp. and Dir. OWCP, USDOL,* 77–BLA–388 (1977), *reprinted in* App., at 155, 156. Up to this point in the proceedings, we have not been directed to any place in the record where the Director challenged this legal view.

### (B) *The Benefits Review Board*

The Director subsequently petitioned for review before the Board on the ground that the Hearing Officer had "erred in interpreting Sections [921(c)(3) and 932(c)] of the Black Lung Act." Petition for Review, *reprinted in* App., at 160. The Memorandum of Law submitted in support of its petition made only one argument on how these Sections should be interpreted: "The irrebuttable presumption of Section 9[2]1(c)(3) is to operate to assist claimants in proving entitlement and not to assist employers in escaping liability under the Act." Memorandum of Law in Support of Petition for Review, *reprinted in* App., at 161, 163. The Director reasoned that while a miner suffering from complicated pneumoconiosis could rely on the provision to *establish* his total disability, an employer could not rely on the irrebuttable presumption to prove definitively that the miner was previously totally disabled and therefore his disability could not "arise, at least in part" while the miner worked for the employer. The Director also suggested the liability would not arise until the miner was aware of his illness and its legal implications.

---

7. North American explained that the x-ray actually referred to in the letter had been taken on August 16, 1972, but it had independently discovered the February 13, 1970 x-ray. Letter of August 6, 1977 from David S. Millstone to Honorable Charles P. Rippey, Hearing Officer, *reprinted in* App., at 152–53.

The Director made two other arguments, but they were simply criticisms of the Hearing Officer's interpretation. First, the Hearing Officer's interpretation would supposedly create a perverse incentive for employers and claimants to push liability back to a point where no employer could be held liable. Thus, it would cause the resources of the Fund to be overtaxed. Second, it would supposedly lead to an irrational result by failing to transfer financial responsibility to employers responsible for causing injury to their employees. For these reasons, the Director suggested that North American could not avail itself of the presumption, and the decision of the Hearing Officer should be reversed.

The Board explicitly rejected the interpretation of Section 921(c)(3) advanced by the Director and affirmed the decision of the Hearing Officer. It stated, *inter alia*:

In essence, the Director is arguing that the Section [921(c)(3)] irrebuttable presumption has been rebutted by the fact of the claimant's continued employment with the employer. This assertion is clearly erroneous. Once the existence of complicated pneumoconiosis is established, the claimant is *irrebuttably* presumed totally disabled due to pneumoconiosis. 30 U.S.C. § 921(c)(3); *Nemec v. Lehigh Valley Anthracite, Inc.*, 7 BRBS 661, BRB No. 77–156 BLA (Jan. 25, 1978). One may not rebut an irrebuttable presumption. Although it has been recognized that the Section [921(c)(3)] presumption is a harsh remedy from the viewpoint of the one opposing entitlement, the Supreme Court has upheld the constitutionality of this presumption while noting that its underlying purpose and rationale is not only to provide compensation for the claimant's economic loss but also to provide deferred compensation for the loss of health of the miner and the suffering caused his dependents as a result of this loss of health. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 ['96 S.Ct. 2882, 49 L.Ed.2d 752] (1976). . . . Thus, it has been held that a claimant may properly be found entitled to black lung benefits beginning with the month in which complicated pneumoconiosis was diagnosed even though he continued to be employed as a miner in the interim.

*Truitt v. North American Coal Corp.*, 10 BRBS 159, 164, BRB Nos. 77–644 BLA & 77–644 BLA–A (March 26, 1979).

The Director made one final argument when he subsequently petitioned the Board to reconsider the case and allow a remand. He contended that he should be allowed to introduce evidence on North American's potential liability as a "successor operator." Memorandum in Support of Director's Motion for Reconsideration, *reprinted in* App., at 215. Evidence in the record suggested that North American might have taken over the mine from Truitt's previous employer who would have been liable under the Act. The regulations provided for liability for a successor employer where the successor had assumed substantially all the assets of the mine.[8] The Board denied the request for a remand to introduce evidence on this issue on the ground that the Director had had ample opportunity below to submit evidence on successor liability.

Thus, the Director made only two separate arguments before the Board. First, the irrebuttable presumption could only be used affirmatively to establish the defendant employer's liability, not defensively to establish that the defendant employer was not liable because a prior employer was totally liable. Second, the Board should remand so as to allow the Director to intro-

---

**8.** 20 C.F.R. § 725.304(a) (1974) provided:

In accordance with Section 422(i) of the Act, any coal mine operator who, on or after December 30, 1969, acquired his mine or substantially all the assets of his mine from a prior operator who was an operator of that mine on or after December 30, 1969, shall be liable for and shall, . . . secure the payment of all benefits which would have been payable by the prior operator with respect to miners previously employed in that mine if the acquisition had not occurred and the prior operator had continued to operate the mine.

In the Board's opinion it had criticized the Director for failing to introduce evidence on the issue of succession before the Hearing Officer.

duce evidence of North American's liability as a successor employer.

### (C) *The Court of Appeals*

■ In the Director's petition for review in this court, he has adopted a new legal position. He does not argue that the Section 921(c)(3) irrebuttable presumption of total disability cannot be used as a defense. Rather, he argues that any employer can be held liable under the Act for "aggravating" an existing illness that was presumed to result in total disability.

> This principle of aggravation is that the employer takes the employee "as is," and any activation, hastening, or aggravation of an employee's pre-existing medical condition by industrial trauma or hazardous exposure means that the entire disability is compensable.

Appellant's Brief at 14. Thus, the Director reasons that the Board erred when it

> endorsed without hesitation the concept that if a miner had complicated pneumoconiosis and was therefore presumed totally disabled under 30 U.S.C. § 921(c)(3), a subsequent coal mine employer could not be liable for black lung benefits pursuant to 30 U.S.C. § 932(c). This reasoning was based on the general premise that once totally disabled, an employee cannot be further harmed by work-related injury or exposure. The hearing officer and Benefits Review Board, however, applied these rules mechanically, and without reference to authority. Review of law on this point suggests that the conclusions made by the tribunals below were incorrect.
>
> The principle that an employee once totally disabled cannot again be totally disabled would conceivably arise from the logic that total disability means 100% impairment, leaving no room for any additional injury or damage to the employee. However, the case law barring recovery to previously totally disabled employees has in fact not used such reasoning. Indeed, [as the court] in *Mayti v. Singer Manufacturing Co.*, [76 N.J.Super. 379,] 184 A.2d 670, 672 (Union County Court,

New Jersey, 1962), *aff'd* [79 N.J.Super. 556,] 192 A.2d 310 (1963), stated:

> An award of compensation for 100% total disability is not an adjudication that the employee is in fact physically 100% disabled. Such an award merely adjudges that his disabilities as an economic working unit are such as to entitle him to statutory compensation.
>
> The criteria the courts have advanced to prevent additional awards to previously totally disabled workers' compensation claimants have instead focused on two items: (1) the fact that the employer was already paying compensation on a permanent, total disability award and was asked to pay a second award to the same employee for a different injury; and (2) the state workers' compensation statute prohibited an employer paying compensation exceeding the total disability amount. . . .
>
> Where, as in the *Truitt* case *sub judice*, these two factors are not present, the courts have dealt with employers' defenses of pre-existing total disability by relying on the paramount goal of workers' compensation law of making an employee's work-related injury a cost of doing business. . . . The absence of a pre-existing total disability award in the instant *Truitt* claim means that there is no hindrance to applying the aggravation principle to this case to determine if North America's employment of Mr. Truitt aggravated, hastened, or contributed to his complicated pneumoconiosis.

Appellant's Brief at 17–20 (footnote omitted).

In other words, the Director does not argue that an employer *cannot* rely on the irrebuttable presumption to prove that his employee was totally disabled before he worked for him. Instead he argues for the first time that a finding of total disability does not preclude the employer's liability because he may be responsible for "aggravation" of the total disability. Thus, for the first time the Director refers to the application to this case of the principle of aggravation under the Longshoremen's and

Harbor Workers' Compensation Act (LHWCA) and workers' compensation law. Rather than seek a reversal as he did before the Board, the Director now seeks a remand to put on evidence concerning aggravation of Truitt's illness by North American. The Director has raised a new legal argument with fundamental and far-reaching implications for administration of the Fund even though it was never brought to the attention of, or considered by, the Board or the Hearing Officer.

## II

It is generally recognized that under the doctrine of exhaustion of administrative remedies a court should not consider an argument which has not been raised in the agency proceedings which preceded the appeal, absent unusual circumstances. As the Supreme Court announced over thirty years ago in *Unemployment Compensation Commission of Territory of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946):

> A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action.

The rationale behind this doctrine, as expressed in *United States v. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952), is that "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only erred but has erred against objection made at the time appropriate under its practice." Such restraint is particularly important in a case such as this where appellants have proffered an argument with far-reaching implications for liability under the Act without benefit of the agency's expert evaluation. *See generally* 3 K. Davis, Administrative Law Treatise, §§ 20.06 (1958 and 1976 Supp.). Thus, this court in *Sea-Land Service v. Director, Office of Workers' Compensation Programs*, 552 F.2d 985, 987–88

n.1 (3d Cir. 1977), has similarly refused to consider an argument made in an appeal brought from the Board because the argument had not been made to the Board.

The Director does not claim we should decide the issue if we conclude that he did not raise the argument before the Board. Rather he claims his argument on the "principle of aggravation" was raised in his memorandum of law accompanying his petition for review by the Board, although he concedes that the Board did not address the argument. Appellant's Reply Brief at 1–2. He points to the third section of his memorandum in which he argued that the Act should be construed "to avoid an irrational result." The interpretation he offered in this section of the memorandum was the one initially adopted by the Hearing Officer when he denied the motion to dismiss. The memorandum quoted the following statement from the Hearing Officer:

> . . . I'm going to rule as a matter of Law that a mine operator that hires a miner who had complicated pneumoconiosis and employs him for a period of a year is liable as the last responsible operator. There are many miners with complicated pneumoconiosis who are in fact are not disabled and who are in fact employed. Not many, some and there are many collecting benefits for total disability with complicated pneumoconiosis who are working every day in the mines and that's what the Law provides, that it's an irrebuttable presumption of total disability.
>
> However, the condition of pneumoconiosis is progressive and can get worse even though a person has complicated pneumoconiosis, it's not a category that's [a] medically sealed entity and the Claimant's condition can be contributed to significantly by employment even subsequent to the time that he has complicated pneumoconiosis.

Petition for Review, *reprinted in* App., at 167–68. The Director would now have us interpret his mere quotation of the Hearing Officer's statement as a request for the Board to adopt the aggravation principle.

We think the Director has misrepresented the memorandum of law. The memoran-

dum argued that the irrebuttable presumption could be used only by a claimant, not an employer. Its citation of the statement by the Hearing Officer only established that a defensive use of the irrebuttable presumption was not permitted since a person could become more disabled. It did not state, as the Director now argues, that an employer could be held liable for aggravating a total disability.

This conclusion is reinforced by our observation that the Director asked for a reversal before the Board, not a remand in order to introduce evidence on aggravation. He has not been able to refer us to *any* place in the record where the aggravation principle itself was mentioned or the elaborate analogies to workers' compensation law and the LHWCA which are now offered. Finally, as the Director concedes, the Board itself must not have understood the Director to raise the argument because it never addressed the aggravation principle.

### III

For these reasons, we find that the sole argument raised before us was not raised below before the Board. We will therefore dismiss the appeal.