**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 24-2212**

───────────────

RHINO ENERGY, LLC,

              Petitioner,

      v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR; ROBERT B. RULE,

              Respondents.

───────────────

On Petition for Review of an Order of the Benefits Review Board.  (23-0451 BLA)

───────────────

Argued:  January 28, 2026                    Decided:  April 23, 2026

───────────────

Before WILKINSON, Circuit Judge, FLOYD, Senior Circuit Judge, and David J. NOVAK, United States District Judge for the Eastern District of Virginia, sitting by designation.

───────────────

Petition for review granted; order vacated and remanded by published opinion.  Judge Novak wrote the majority opinion, in which Judge Floyd joined.  Judge Wilkinson wrote a dissenting opinion.

───────────────

**ARGUED:**  Denise Hall Scarberry, BAIRD & BAIRD, P.S.C., Pikeville, Kentucky, for Petitioner.  Brad Anthony Austin, WOLFE, WILLIAMS & AUSTIN, Norton, Virginia; Michael P. Doyle, Philadelphia, Pennsylvania, for Respondent.  **ON BRIEF:** Jonathan L. Snare, Acting Solicitor of Labor, Jennifer Feldman Jones, Acting Associate Solicitor, Olgamaris Fernández, Acting Deputy Associate Solicitor, Sean Bajkowski, Office of the

Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent.

————————

David J. NOVAK, United States District Judge for the Eastern District of Virginia, sitting by designation:

Rhino Energy, LLC ("Rhino") appeals a decision of the Benefits Review Board (the "Board") requiring it to pay benefits pursuant to the Black Lung Benefits Act ("BLBA" or the "Act"), 30 U.S.C. §§ 901–944, to Robert B. Rule, a miner who worked in our Nation's mines for nearly 40 years. Rhino argues that Rule's more recent employer, Wildcat Energy, LLC ("Wildcat"), should have been required to pay Rule's benefits instead. Because the administrative law judge ("ALJ") erred when interpreting relevant regulatory provisions and because her misinterpretation led to other errors in her decision, we grant Rhino's petition for review, vacate the Board's order affirming the ALJ's decision and, as mandated by law in such cases, remand to the Board to direct the Black Lung Disability Trust Fund to pay Rule's benefits.

## I.

### A.

The BLBA allows coal miners who are totally disabled by pneumoconiosis, also known as black lung disease, and their surviving dependents to apply for and receive benefits. Congress created the Black Lung Disability Trust Fund (the "Fund") to help provide those benefits. 26 U.S.C. § 9501.[1] However, Congress also authorized the

---

[1] We note that Congress recently made permanent the tax mechanism underlying the Fund, guaranteeing continued funding for payments to miners. Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat 1818, 2013 (2022).

3

Department of Labor ("DOL") to establish regulations ensuring that the Fund would not bear the sole burden of funding black lung claims and that coal mine operators would be "liable to the maximum extent feasible for awarded claims." *Arkansas Coals, Inc. v. Lawson*, 739 F.3d 309, 313 (6th Cir. 2014) (internal quotation omitted); *see* 26 U.S.C. § 9501(d)(1) (deferring to Secretary of Labor's determination of operator liability); 30 U.S.C. § 932(h) ("The Secretary may also, by regulation, establish standards for apportioning liability for benefits under this subsection among more than one operator, where such apportionment is appropriate."). Under those regulations, mine operators are "potentially liable" to pay benefits if they meet five conditions, including two requirements at issue in this litigation: they employed the miner "for a cumulative period of not less than one year," as that term is defined in 20 C.F.R. § 725.101(a)(32), and they have the financial capability to assume liability for the payment of a miner's benefits. 20 C.F.R. § 725.494(a)–(e). Operators that employed miners for less than one year may still qualify for BLBA liability as "successor operators" if they acquired another operator's mines, as long as that predecessor operator satisfies the 20 C.F.R. § 725.494 conditions, including employing the miner in question for a cumulative period of not less than one year. 20 C.F.R. §§ 725.492; 725.494(c).

DOL's Office of Workers' Compensation Programs ("OWCP") ultimately designates one "responsible operator"[2] for BLBA liability purposes. That operator is the

---

[2] An "operator" is "any owner, lessee, or other person who operates, controls or supervises a coal mine, including a prior or successor operator . . . and certain transportation and construction employers." 20 C.F.R. § 725.101(a)(23).

4

miner's most recent employer that qualifies as a "potentially liable operator" under the above criteria.  20 C.F.R. § 725.495(a)(1).  If the miner's most recent employer does not meet all required conditions, then "the responsible operator shall be the potentially liable operator that next most recently employed the miner."  20 C.F.R. § 725.495(a)(3).  If "there is no operator who is liable for the payment of such benefits," the Fund provides benefits.  26 U.S.C. § 9501(d)(1)(B).

DOL's regulations lay out a detailed procedure for identifying the responsible operator within DOL's three-step administrative adjudication process.  *Hobet Mining, Inc. v. Dir., Off. of Workers' Comp. Programs*, 156 F.4th 385, 388–89 (4th Cir. 2025).  Initially, a district director in a local OWCP office has the responsibility to designate a responsible operator.  In reviewing a miner's initial claim, the district director must investigate whether any former employers satisfy the conditions to qualify as a potentially liable operator.  20 C.F.R. § 725.407(a).  Then, the district director identifies and notifies all such operators of the miner's claim.  20 C.F.R. § 725.407(b).  Within 30 days, each operator must accept or contest its identification as a potentially liable operator.  20 C.F.R. § 725.408(a)(1).  If an operator contests its identification, it must state "the precise nature of its disagreement" with the premise that it meets all relevant factors for liability.  20 C.F.R. § 725.408(a)(2).  The operator has ninety days to submit any relevant documentary evidence, both as to its own potential liability for the claim and as "relevant to the liability of another party."  20 C.F.R. § 725.408(b)(1); *see also Marfork Coal Co. v. Weis*, 251 F. App'x 229, 235 (4th Cir. 2007) (quoting Regulations Implementing the Federal Coal Mine Health and Safety

5

Act of 1969, as Amended, 65 Fed. Reg. 79,920 (Dec. 20, 2000) ("DOL Commentary") at 79,999).

After receiving the operators' responses, the district director designates a responsible operator and issues a Schedule for the Submission of Additional Evidence (the "Schedule"). 20 C.F.R. § 725.410(a). If the district director designates an employer other than the miner's most recent employer, the district director must provide additional statements. First, in all such cases, he must set forth his reasons for designating that operator in a statement (the "Statement of Reasons"). 20 C.F.R. §§ 725.410(a)(3); 725.495(d). Second, if the miner's most recent employer fails to qualify as a potentially liable operator because it lacks financial capacity to cover the miner's claim, the district director must certify that he searched OWCP's records and found no record of that operator's insurance coverage or authorization to self-insure (the "Coverage Statement"). 20 C.F.R. § 725.495(d). The district director's Coverage Statement "shall be prima facie evidence that the most recent employer is not financially capable of assuming liability for a claim." *Id.* However, and significant to this litigation, where the district director does not file such a Coverage Statement concerning a miner's most recent employer, "it shall be presumed that the most recent employer is financially capable of assuming its liability for a claim." *Id.*

After the district director issues his Schedule and designates a responsible operator, the designated operator can accept or contest its designation. 20 C.F.R. §§ 725.410(b); 725.412(a)(1). After reviewing all of the evidence, the district director may issue another schedule for the submission of additional evidence "identifying another potentially liable

6

operator as the responsible operator liable," or he may schedule an informal conference. 20 C.F.R. §§ 725.415; 725.416.  Ultimately, at the end of his fact-finding process, the district director must issue a proposed decision and order, confirming his final designation and dismissing all other potentially liable operators that received notification of the claim. 20 C.F.R. §§ 725.415(a)-(b); 725.418(d).  If the director does not ultimately designate the miner's most recent employer, the record must contain his Statement of Reasons and, where applicable, his Coverage Statement.  20 C.F.R. § 725.495(d); *Westmoreland Coal Co. v. Dir., Off. of Workers' Comp. Programs, United States Dep't of Lab.*, 696 F. App'x 604, 606 (4th Cir. 2017) (per curiam).

At this stage, the designated operator may object to its designation and request that the case be transferred to the Office of Administrative Law Judges.  At that point, the burden of proof shifts to the designated operator to prove that "it is *not* the potentially liable operator that most recently employed the miner."  20 C.F.R. § 725.495(c)(2) (emphasis added); *Hobet Mining, Inc.,* 156 F.4th at 389 n.4 ("the burden then shifts to the responsible operator to prove that 'it does not possess sufficient assets to secure the payment of benefits' or that 'it is not the potentially liable operator that most recently employed the miner.'").  In seeking to meet that burden, the designated operator may only cite to the evidence presented to the district director, absent extraordinary circumstances.  *Hobet Mining, Inc.,* 156 F.4th at 390; § 725.456(b)(1).

Notably, 20 C.F.R. § 725.495(c)(2) imposes an additional evidentiary burden on potentially liable operators contesting their designation: "[i]n order to establish that a more recent employer is a potentially liable operator, the designated responsible operator must

7

demonstrate that the more recent employer possesses sufficient assets to secure the payment of benefits in accordance with § 725.606." *Id.* However, potentially liable operators are only required to provide evidence that the more recent employer possesses sufficient assets to secure the payment of benefits in those cases where the director designated an prior operator because the more recent employer lacked financial capability and accordingly provided a Coverage Statement that constitutes prima facie evidence that the "most recent employer is not financially capable of assuming its liability for a claim." 20 C.F.R. § 725.495(d). Within that subset of cases, where "the director satisfies the prima facie requirement by searching the office files, the burden shifts to the designated responsible operator to demonstrate that the more recent employer possesses sufficient assets to secure the payment of benefits in accordance with § 725.606." *Arkansas Coals, Inc.*, 739 F.3d at 313–14 (internal quotation omitted). Importantly, that additional evidentiary burden is not triggered in cases like this one, where the district director made no finding at all as to financial capability.

The ALJ then decides whether to affirm or vacate the district director's designation. If any party disagrees with the ALJ's decision, it can appeal the results to the Benefits Review Board. 20 C.F.R. § 725.481. The Board reviews the findings of fact and conclusions of law underlying the ALJ's decision to ensure that these are supported by substantial evidence. 20 C.F.R. § 802.301(a). "But the Board is not 'empowered to engage in a de novo proceeding or unrestricted review of a case brought before it.'" *Hobet Mining, Inc.,* 156 F.4th at 390–91 (quoting § 802.301(a)).

8

Significant to this litigation, if the designated operator prevails on appeal, liability for the claim is not transferred to another operator that should have been designated. Instead, benefits are paid by the Black Lung Disability Trust Fund. *Id.* at 390, 401; *see also Dir., Off. of Workers Comp. Programs, U.S. Dep't of Lab. v. Consolidation Coal Co.*, 923 F.2d 38, 40 n.1 (4th Cir. 1991) ("The Black Lung Disability Trust Fund was established in 1977 to pay benefits to eligible miners when no responsible operator can be found or made to pay.")  That remains the case even if the actual responsible operator can be identified. *Hobet Mining, Inc.* 156 F.4th at 391 (quoting *Rockwood Cas. Ins. Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 917 F.3d 1198, 1215 (10th Cir. 2019)) ("even if the district director incorrectly identifies the responsible operator and refers the case to an ALJ, a new responsible operator may not be named.").

B.

We note at the outset of this case that the parties do not dispute that the miner in this case, Robert Rule, is entitled to receive benefits.  Instead, the parties disagree as to which of Rule's employers should have been required to pay those benefits.

Robert Rule worked for various coal mine operators in West Virginia for a total of 38 years, from 1975 to 2015.  As relevant here, from mid-2012 through December 2014, Rule worked for Rhino Energy, LLC in the Eagle #1 and #3 mines in Bolt, West Virginia. Rhino served as a subcontractor for Wildcat Energy, LLC, the mines' owner, during this time.  When Rhino ended its subcontract with Wildcat at the end of 2014, Rule and the other miners working at Eagle #1 and #3 joined Wildcat's payroll and continued working

9

at Eagle #3.  Rule continued to work for Wildcat at the Eagle #3 mine from January to October 2015 before retiring.

Rule filed a claim for benefits under the BLBA on February 7, 2017.  On March 6, 2017, the district director overseeing Rule's claim notified Rhino that it had been identified as a potentially liable coal operator for Rule's BLBA benefits.  On March 27, 2017, Rhino submitted its response and its first Motion to Dismiss, requesting that it be dismissed as a designated operator, because Rule last worked for Wildcat, not Rhino.  The district director responded on May 1, 2017, rejecting Rhino's arguments based on his view of "the evidence in the file."  J.A. 44.[3]

On January 30, 2018, the district director issued his Schedule designating Rhino as the responsible operator.  Even though Rhino was "not the operator that most recently employed the miner," the district director found that Rhino satisfied all conditions to be a potentially liable operator.  J.A. 53.  Additionally, he found that Wildcat had not employed Rhino for the requisite "12 cumulative months" required to have employed a miner for a year under 20 C.F.R. § 725.101(a)(32), so it could not be a potentially liable operator responsible for Rule's benefits.  *Id.*  The district director provided no other basis for his conclusion that Rhino, rather than Wildcat, constituted the responsible operator in Rule's case.  He did not address Wildcat's financial capability to pay for Rule's benefits and did

---

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

10

not include a Coverage Statement indicating that he had searched OWCP records for information about Wildcat's insurance status.

Rhino submitted its response to the Schedule and its second Motion to Dismiss on February 7, 2018, this time asserting that, because Wildcat took over operations at the Eagle #3 mine from Rhino, Wildcat should be considered a "successor operator" under the BLBA's regulations, which would allow the time that Rule worked for Rhino to be imputed to Wildcat and thereby render Wildcat a potentially liable operator under 20 C.F.R. § 725.493(b)(1). Here again, nothing in the record indicates that the district director ever responded to Rhino's second Motion or otherwise addressed this issue.

On October 25, 2018, the district director issued a Proposed Decision and Order awarding Rule benefits under the BLBA and designating Rhino as the coal mine operator responsible for paying those benefits. The district director reiterated his view that although Rhino was "not the operator that most recently employed the miner," Wildcat had employed Rule for less than 12 cumulative months, rendering Wildcat ineligible to be a potentially liable operator. J.A. 145. The director again cited no other grounds, such as Wildcat's financial capability or lack thereof, supporting his conclusion that Wildcat was not a potentially liable operator. Further, the district director did not address Rhino's argument, raised in its second Motion to Dismiss, that Wildcat constituted a "successor operator" and that Rule's employment with Rhino should be imputed to Wildcat under 20 C.F.R. § 725.493(b)(1).

Rhino timely submitted its opposition to the director's Proposed Decision and Order and requested a formal hearing before the Office of Administrative Law Judges. On July

11

26, 2023, an ALJ issued her Decision and Order affirming the director's designation of Rhino as the operator responsible for paying Rule's benefits.[4]  In designating Rhino as the responsible operator, the ALJ focused almost exclusively on the fact that Rhino had employed Rule for more than one calendar year, whereas Wildcat had only employed Rule for ten months.  The ALJ briefly considered Rhino's argument that Wildcat should be considered its "successor operator" but found it meritless based on her interpretation of the governing regulation, 20 C.F.R. § 725.492(d).

Rhino subsequently petitioned for the Board's review of the ALJ's decision.  On October 11, 2024, the Board affirmed the ALJ's Order designating Rhino as the responsible operator.  It agreed with the ALJ's finding that Wildcat had not employed Rule for a sufficient amount of time to qualify as a potentially liable operator.  Further, it also upheld the ALJ's cursory dismissal of the successor operator issue, stating that "[t]he existence of a predecessor-successor operator relationship alone does not automatically relieve [Rhino] of liability."  J.A. 344.  Finally, the Board raised, for the first time in this litigation, the argument that even if the ALJ did err in her analysis as to the length of Rule's employment with Wildcat and the existence of a successor-operator relationship between Wildcat and Rhino, Rhino failed to satisfy its burden to "identify any evidence showing Wildcat is financially capable of paying benefits" under 20 C.F.R. § 725.495(c)(2), which shifts the

---

[4] Before the ALJ, the parties also contested three additional issues:  whether Rule suffered from pneumoconiosis, whether his pneumoconiosis arose from coal mine employment and whether Rule's total disability occurred due to pneumoconiosis. Only the responsible operator issue is contested in this appeal.

12

burden of proof to the designated operator to establish that it should *not* be found liable. J.A. 343.  For all of these reasons, the Board upheld the ALJ's conclusion that Wildcat was not a potentially liable operator and that Rhino stood liable to pay Rule's benefits.

On December 9, 2024, Rhino petitioned for our review of the Board's Decision and Order affirming the ALJ's analysis.

## II.

"Any person adversely affected or aggrieved by a final order of the Board may obtain a review of that order in the United States court of appeals for the circuit in which the injury occurred," conferring jurisdiction upon us over Rhino's petition.  33 U.S.C. § 921(c).

In cases reviewing an order of the Board affirming an ALJ's decision, we independently review the record to determine "whether substantial evidence supports the factual findings of the ALJ and whether the legal conclusions of the [Board] and ALJ are rational and consistent with applicable law."  *Harman Min. Co. v. Dir., Off. of Workers' Comp. Programs*, 678 F.3d 305, 310 (4th Cir. 2012) (citing *Lewis Coal Co. v. Dir., Off. of Workers' Comp. Programs,* 373 F.3d 570, 575 (4th Cir. 2004)); *Westmoreland Coal Co.*, 696 F. App'x at 604.  The ALJ, as the trier of fact, renders factual and credibility determinations, and we "therefore defer to the ALJ's evaluation of the proper weight" of any conflicting evidence.  *W. Virginia CWP Fund v. Dir., Off. of Workers' Comp. Programs, United States Dep't of Lab.*, 880 F.3d 691, 697 (4th Cir. 2018).  However, we review de novo the legal conclusions of the Board and the ALJ, including on "issues of

13

regulatory construction." *Romero v. Barr*, 937 F.3d 282, 290 (4th Cir. 2019); *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998).

## III.

As we have explained, the parties do not dispute that Rule qualifies for BLBA benefits or that Rhino constitutes a potentially liable operator for payment of those benefits. The sole issue before us consists of whether Wildcat also constitutes a potentially liable operator and, as Rule's more recent employer, should have been designated as the operator responsible for paying Rule's benefits. Rhino asserts that the ALJ erred in designating it as the responsible operator for three reasons: (1) Wildcat did, in fact, employ Rule for one year under the plain text of 20 C.F.R. § 725.101(a)(32)[5]; (2) the ALJ did not fulsomely consider whether Wildcat constituted a successor operator[6]; and (3) the ALJ failed to consider whether Rhino was entitled to a presumption that Wildcat remains financially capable of covering Rule's benefits. The Director, Office of Workers' Compensation Programs ("DOWCP"), concedes the ALJ's error in failing to make findings as to whether

---

[5] In his brief, Rule makes the same argument, requesting that we reject the ALJ's holding regarding Rhino's liability, because the plain meaning of 20 C.F.R. § 725.101(a)(32) indicates that Wildcat employed Rule for a year.

[6] Rhino also suggests, in passing, that the ALJ's failure to consider whether Wildcat was a successor to Rhino violated the Administrative Procedure Act ("APA"). (Petitioner's Opening Brief at 24.) We find that Rhino waived any such argument, because it mentioned the APA only once in its opening brief and did not develop any argument as to this claim. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021) (refusing to consider claim where Petitioner "devotes less than a page of briefing" to the issue presented, because "[i]t is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel," and "perfunctory and undeveloped arguments . . . are waived.")

14

a predecessor-successor relationship existed between Wildcat and Rhino. However, DOWCP argues that such error is harmless, because Wildcat did not employ Rule for one year under 20 C.F.R. § 725.101(a)(32) and Rhino failed to establish that Wildcat had the financial capability to pay Rule's claim, dooming Rhino's appeal under either rationale. For the reasons set forth below, we agree with Rhino that Wildcat should have been designated as the responsible operator for Rule's claim.

## A.

### 1.

We begin with the parties' dispute over whether Wildcat employed Rule for the requisite amount of time to constitute a potentially liable operator. We recently set forth the proper interpretation of the BLBA's definition of a year in *Baldwin on behalf of Baldwin v. Dir., Off. of Workers' Comp. Programs, United States Dep't of Lab.*, 170 F.4th 273 (4th Cir. 2026) ("*Baldwin*"). In light of *Baldwin*'s holding, we find that the ALJ misinterpreted the plain meaning of a year as defined in 20 C.F.R. § 725.101(a)(32), and therefore erred in finding that Wildcat had not employed Rule for a full year.

20 C.F.R. § 725.494(c) requires an operator to employ a miner "for a cumulative period of not less than one year" to be considered potentially liable for that miner's BLBA benefits. In *Baldwin,* we joined the Sixth Circuit's approach, laid out in *Shepherd v. Incoal, Inc.,* 915 F.3d 392 (6th Cir. 2019), for calculating a miner's year of employment under the BLBA. 170 F.4th at 282. We held that 20 C.F.R. § 725.101(a)(32) allows a miner to establish a year of employment by showing that he worked at least 125 working days in and around a coal mine during a one-year period. *Id*. at 287. We further clarified that the

15

plain language of the regulation does not require a miner to demonstrate an employment relationship lasting one calendar year to establish a year of employment for BLBA purposes. *Id.*

The parties agree, and the ALJ explicitly found, that Rule established at least 125 working days with Wildcat in 2015. J.A. 271.[7] However, every factfinder involved in the three-step administrative adjudication below concluded that, because Wildcat only employed Rule for ten months, Wildcat could not constitute a potentially liable operator, regardless of how many working days that Rule had established. In particular, the ALJ relied upon her understanding that two of our opinions, *Armco Inc. v. Martin,* 277 F.3d 468 (4th Cir. 2002) and *Daniels Co., Inc. v. Mitchell,* 479 F.3d 321 (4th Cir. 2007), constituted binding precedent imposing a threshold requirement on a miner to establish a year-long employment relationship and 125 working days within that relationship to establish a year of employment.

This erroneous interpretation of 20 C.F.R. § 725.101(a)(32) has since been foreclosed by our holding in *Baldwin*. In *Baldwin,* we held that "*Armco* and *Daniels* do not bind our interpretation of § 725.101(a)(32)" because their discussion of 20 C.F.R. § 725.101(a)(32) constituted dicta. 170 F.4th at 291. Instead, to establish a year of employment "for all purposes under the Act," Rule need only have worked for Wildcat for 125 working days within a year-long period. *Id.* at 287. Since he did so here, Wildcat necessarily employed Rule for a year for the purposes of the BLBA and 20 C.F.R.

---

[7] We affirm that substantial evidence supports this finding by the ALJ.

§ 725.494(c). We therefore hold that as a matter of law, the ALJ erred when finding that Wildcat had employed Rule for less than a year under 20 C.F.R. § 725.101(a)(32), and thus erred in concluding that Wildcat did not constitute a potentially liable operator on that basis.

2.

Rhino argues that the ALJ also erred in dismissing Rhino's arguments that Wildcat should be considered a successor operator without making any findings regarding that question. According to Rhino, if the ALJ had correctly considered whether Wildcat was Rhino's successor, she would have aggregated the time that Rule worked for Wildcat with the time that he worked for Rhino, establishing that his employment with Wildcat lasted longer than a calendar year. *See* 20 C.F.R. § 725.493(b)(1) (emphasis added) ("In any case in which an operator may be considered a successor operator . . . any employment with a prior operator *shall also be deemed to be employment with the successor operator*"); 20 C.F.R. § 725.494(c) (emphasis added) ("The miner was employed by the operator, *or any person with respect to which the operator may be considered a successor operator*, for a cumulative period of not less than one year."). DOWCP concedes the ALJ's error in failing to consider this question. In light of our finding that Rule already established a year of employment with Wildcat on the basis of his working days under 20 C.F.R. § 725.101(a)(32), we need not resolve the question of successor operator liability here. Rather, we turn to the remaining dispute between the parties concerning Wildcat's financial capability to pay Rule's benefits and the showings required to render such a finding.

17

B.

To displace Rhino as the most recent potentially liable operator, Wildcat must satisfy all of the requirements of a potentially liable operator under 20 C.F.R. § 725.494, including having the financial capability to cover Rule's claim. *See* 20 C.F.R. § 725.494(e) (a potentially liable operator must be "capable of assuming its liability for the payment of continuing benefits under this part"). The parties disagree as to whether Wildcat should be deemed financially capable of assuming liability for Rule's benefits. That disagreement boils down to a dispute about whether the district director's choice not to promulgate a "Coverage Statement" under 20 C.F.R. § 725.495(d) established a presumption that Wildcat should be considered financially capable of paying Rule's benefits. We must now resolve this dispute.

We briefly review the relevant procedural avenues for determining an operator's financial capability to pay BLBA benefits. In the first instance, the district director adjudicating a miner's BLBA claim may deem an operator capable of assuming liability if (1) the operator has insurance coverage to cover the claim (barring certain exceptions); (2) the operator qualifies as a self-insurer, with certain conditions; or (3) the operator possesses sufficient assets to secure the payment of benefits in certain types of claims. 20 C.F.R. §§ 725.494(e); 725.415(a)-(b); 725.418(d). Where the district director finds that an operator lacks the financial capability to cover the claim, a reviewing ALJ or the Board may look to the district director's preparation of a "Coverage Statement," which attests that the director has verified the lack of any records of recent insurance coverage or authorization to self-insure. 20 C.F.R. § 725.495(d) sets forth the effect of the Coverage

18

Statement (or its absence) on whether an operator qualifies as financially capable of paying BLBA benefits. Where a Coverage Statement exists in the record, that statement constitutes "prima facie evidence that the most recent employer is *not* financially capable of assuming its liability for a claim." *Id.* (emphasis added). By contrast, where the district director did not prepare a Coverage Statement, "it shall be presumed that the most recent employer *is* financially capable" of assuming liability. *Id.* (emphasis added).

Turning to the record before us, we first note that because both the district director and the ALJ relied solely upon their erroneous understanding that Rule had not worked for Wildcat for a year under § 725.101(a)(32) when designating Rhino as the liable operator, the record stands devoid of any evidence whatsoever regarding Wildcat's financial capability. Because the district director's Statement of Reasons did not mention Wildcat's financial capability, he did not prepare a Coverage Statement to accompany that Statement of Reasons. Thus, we must decide here whether the absence of a Coverage Statement properly triggered the presumption under 20 C.F.R. § 725.495(d) that Wildcat stands financially capable of paying Rule's claim, and whether Rhino properly relied on that presumption to meet its burden of proof in establishing that Wildcat is financially capable of assuming liability for this claim.

Rhino argues that because the district director did not provide a Coverage Statement, Wildcat must be presumed to be financially capable of assuming liability for a claim under 20 C.F.R. § 725.495(d). In other words, "the mere fact that the District Director failed to include such statement is evidence enough to establish that Wildcat is capable of assuming liability." Petitioner's Opening Brief at 15. DOWCP disagrees, arguing that the lack of a

19

Coverage Statement in the record does not trigger the presumption in this case and that therefore, Rhino should have independently proven that Wildcat is financially capable of assuming liability. According to DOWCP, Rhino did not meet its burden, because it failed to present any evidence of Wildcat's financial assets or insurance status to the ALJ or to the Board, precluding a finding that Wildcat constitutes a potentially liable operator. Based on the plain language of 20 C.F.R. § 725.495(d), we agree with Rhino's view of the applicable presumption and find that Wildcat should have been deemed financially capable of covering Rule's benefits.

We begin with the regulation's plain language, applying the traditional tools of statutory construction. *Mohamed v. Bank of Am. N.A.,* 93 F.4th 205, 210 (4th Cir. 2024). If the language of the regulation "has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written." *United States v. Moriello*, 980 F.3d 924, 934 (4th Cir. 2020). As already outlined, where a Coverage Statement is required, verifying that "the Office has searched the files it maintains . . . and that the Office has no record of insurance coverage for that employer, or of authorization to self-insure," such statement "shall be prima facie evidence that the most recent employer is not financially capable of assuming its liability for a claim." 20 C.F.R. § 725.495(d). The regulation sets forth that "[i]n the absence of such a statement, it shall be presumed that the most recent employer is financially capable of assuming its liability for a claim." *Id.* The regulation thus clearly establishes that in cases where no Coverage Statement is required — namely, in all cases where financial capability does not constitute a ground for excluding the most recent operator from designation as the responsible operator — and none is filed,

20

"it shall be presumed" that the most recent employer remains financially able to assume liability for the miner's claim. *Id.*

Our reading of the regulation accords with its context within DOL's regulations governing the applicable burden of proof in BLBA cases. In revamping its rules in 2000, DOL expressly placed the burden on the district director in the first instance to determine all potentially liable operators and to then choose the correct operator as the one responsible for paying the miner's benefits. DOL Commentary at 79,990 ("The Department intends that, once a claim is referred to the Office of Administrative Law Judges, the Department shall not be able to impose liability for that claim on any operator other than the one finally designated as responsible operator by the district director, whether through remand by the administrative law judge or through modification of a finally awarded claim"); *Marfork*, 251 F. App'x at 235 (because DOL intended "to make conclusive a district director's determination of the 'responsible operator' liable for payments . . . [i]t is important that the district director make the right decision."). The district director's responsibility to "make the right decision" makes sense in light of OWCP's available resources. OWCP regularly collects data verifying coal mine operators' insurance status as part of its duty to assist with "the regulation of both [] self-insurance and commercial insurance programs." 20 C.F.R. § 726.6. In fact, an employer may only self-insure if it has applied for authorization from OWCP itself, and, to maintain its authorization, DOL requires such an operator to submit periodic reports to OWCP. 20 C.F.R. §§ 726.102, 726.112. Likewise, DOL requires insurance carriers that insure operators to "report to the Office each policy and endorsement issued, canceled, or renewed by it to an operator." 20 C.F.R. § 726.208. OWCP thus

21

possesses the most updated and accurate information regarding an operator's insurance status, which, for purposes of the responsible operator requirement, constitutes prima facie evidence of its financial ability to pay benefits. 20 C.F.R. §§ 725.495(d); 725.494(e). Presuming that an operator has financial capability to cover a miner's claim upon no contrary showing by the district director therefore conforms with the larger context of DOL's regulations and their emphasis on the district director's duty to diligently investigate and determine which operator should be liable, given OWCP's concomitant duty to maintain updated records of operators' insurance status and the district director's ready access to those records.

Such a reading of the presumption, which eases the burden of the objecting operator at the expense of the district director, also makes practical sense. As Rhino correctly points out, "[a] small coal mine operator that employed ten (10) coal miners with minimal equipment and who obtained a policy of worker's compensation insurance from their local insurance agent[] does not have the capability or resources [to] determine[e] whether a more recent coal mine operator . . . who employed a particular miner had federal black lung insurance as of the date such miner was last employed." Petitioner's Reply at 13. By contrast, as we just noted above, the district director assessing the miner's claim at the first step has access to all potentially liable operators' records and clearly stands best positioned to determine their financial capability. In light of this informational asymmetry, allowing an objecting operator to claim the benefit of a presumption that the most recent operator is financially capable of paying a claim logically places the fact-finding burden on the district director in the first instance.

22

In urging a different interpretation of the regulation, DOWCP asserts that the absence of the Coverage Statement only triggers an evidentiary presumption in the subset of cases that actually *require* a Coverage Statement — namely, those cases in which the district director has expressly concluded that the operator is financially incapable of covering a miner's claim. According to DOWCP, where "no coverage statement [is] required . . . [i]ts absence does not trigger the consequence imposed by sentence four [of 20 C.F.R. § 725.495(d)] – a presumption that Wildcat is financially capable of paying benefits." DOWCP Brief at 15.

DOWCP's interpretation of  20 C.F.R. § 725.495(d) would lead to absurd results. We illustrate its impracticality by drawing out its logical implications in a scenario where a district director has found that a miner's most recent employer does not qualify as a potentially liable operator because he determined, in his Statement of Reasons, that it lacks financial capability to cover a claim. DOWCP's interpretation would mean that the presumption would only kick in for the small subset of such cases where the district director neglected to provide a Coverage Statement verifying that he checked his records and found no proof of financial capability. That negligence would then trigger a presumption that that operator actually *is* financially capable of assuming its liability for a claim. In other words, the presumption that an operator has the financial capability to assume liability would only be triggered in those cases where the district director's Statement of Reasons already declared that the operator is financially *incapable* of assuming such liability. Such an approach would cause widespread confusion amongst claimants and operators and would directly undermine the district director's responsibility to assess the financial

23

incapability of an operator and set forth his findings in the Statement of Reasons. We are duty bound to interpret regulations in a manner that avoids such an absurd result. *United States v. Young*, 989 F.3d 253, 260 (4th Cir. 2021).

We emphasize that such absurd results can be further avoided by requiring district directors to show their work, as the regulations command. In cases where the district director declines to name a miner's most recent employer as the responsible operator and instead designates a prior employer, the regulations require the director to promulgate a complete and fulsome Statement of Reasons "explaining the reasons for such designation." 20 C.F.R. § 725.495(d). Accordingly, in such cases, the district director must indicate findings in his Statement of Reasons as to how all five criteria of 20 C.F.R. § 725.494 apply to the most recent operator *and* the designated operator, rather than focusing on one determinative issue without providing any analysis as to the other factors. Requiring the district director to verify that he has considered all reasons why a prior employer should be designated will contribute to a more comprehensive record on appeal and will minimize avoidable errors of omission that detrimentally impact the Fund, which stands liable to pay a miner's benefits upon a district director's incorrect designation of an operator. *See infra* Section III.D. In other words, a district director may only designate a prior operator instead of the miner's most recent employer after promulgating a substantively comprehensive Statement of Reasons explaining how the most recent employer fails to constitute a potentially liable operator in all relevant ways. If his reasons for doing so do not include the most recent operator's financial inability to cover a claim, he need not promulgate a Coverage Statement, thereby triggering a presumption that the most recent operator is

24

financially capable of assuming its liability for a claim pursuant to the plain meaning of 20 C.F.R. § 725.495(d).

In this case, the district director failed to provide any reference to Wildcat's financial capability in his Statement of Reasons explaining why he designated Rhino, rather than Wildcat, as the responsible operator for Rule's claim, focusing solely on his incorrect conclusion that Wildcat had not employed Rule for a year. He should have instead specified that he had considered Wildcat's financial capability and explained whether that factor did or did not impact his designation of Rhino as the responsible operator. However, because his Statement of Reasons was silent as to whether Wildcat's financial capability factored into his decision to designate Rhino, we must conclude that it did not. Accordingly, because his decision did not rest on Wildcat's lack of financial capability, the district director did not issue a Coverage Statement verifying that he had searched his records for its insurance status. Given the absence of such a Coverage Statement, Rhino stands entitled to a presumption that Wildcat is financially capable of paying Rule's benefits. And because there is no evidence in the record contradicting the 20 C.F.R. § 725.495(d) presumption, we find that Rhino met its burden to establish that Wildcat is financially capable of assuming liability to pay Rule's benefits by relying on the presumption.

C.

In the proceedings below, the district director and the ALJ both erred due to their emphasis on the duration of Rule's employment with Wildcat, to the exclusion of a fulsome consideration regarding whether Wildcat otherwise qualified as potentially liable under

25

20 C.F.R. § 725.494.  The district director erred when designating Rhino as the operator responsible for paying Rule's claim based solely on his understanding that Wildcat did not employ Rule for a full year under the Act, an error that the ALJ repeated by relying on the same incorrect interpretation of 20 C.F.R. § 725.101(a)(32)'s definition of the term "year." The district director and the ALJ's singular focus on the duration of Rule's employment with Wildcat appears to have precluded them from considering the other conditions that Wildcat would have needed to satisfy under 20 C.F.R. § 725.494 to constitute a potentially liable operator for Rule's claim.  The Board, in turn, erred in affirming the ALJ's incorrect reasoning.

We hold today, in light of our ruling in *Baldwin*, that Wildcat did employ Rule for a year as that term is defined in 20 C.F.R. § 725.101(a)(32).  We also find Wildcat financially capable of assuming liability for Rule's claim, because the district director did not provide a Coverage Statement showing that Wildcat lacks insurance or authorization to self-insure and thus triggered the 20 C.F.R. § 725.495(d) presumption, which remains unrebutted by the record evidence.  The parties do not dispute that Wildcat meets the remaining 20 C.F.R. § 725.494 factors to qualify as a potentially liable operator and that Wildcat most recently employed Rule.  We therefore conclude that as a matter of law, Wildcat constitutes the most recent potentially liable operator to employ Rule, and that on this basis, Wildcat should have been designated as the responsible operator in this case.

26

Consequently, we find that the ALJ and the Board erred in upholding the district director's designation of Rhino as the responsible operator.[8]

### D.

Although Rhino should not bear the responsibility to pay for Rule's benefits, the existing regulatory framework prohibits us from ordering that liability be imposed on Wildcat. Rather, DOL regulations require that Rule's claim be paid by the Black Lung Disability Trust Fund. DOL expressly placed the burden on the district director to correctly designate the operator that stands liable to pay a miner's benefits based on the evidence before it. *RB&F Coal, Inc. v. Mullins*, 842 F.3d 279, 281 (4th Cir. 2016); *see Marfork*, 251 F. App'x at 231, 235 (DOL intended "to make conclusive a district director's determination of the 'responsible operator' liable for payments," placing the burden on the district director to resolve any disputes about the identity of the responsible operator and to "make the right decision.") And if the district director's decision turns out to be wrong, the Fund

---

[8] As we explained above, DOWCP concedes that the ALJ also erred when analyzing whether Wildcat was a successor operator to Rhino, comprising a third error that compounded the first two errors in this case. Because the first two issues (the meaning of a year under the BLBA and Wildcat's presumed financial capability) stand dispositive here, we need not decide whether the ALJ's failure to consider whether Wildcat constitutes Rhino's successor operator constitutes harmless error. We note, however, that even if we did reach this issue, we could not decide the harmless error question on this record, where the district director only relied upon one (incorrect) conclusion when finding that Wildcat did not constitute a potentially liable operator, and neglected to specify that he had considered whether Wildcat satisfied the remaining four 20 C.F.R. § 725.494 factors when he promulgated his Statement of Reasons. The sparse record before us illustrates how important it is for the district director, who bears the initial burden to correctly designate the responsible operator, to specify that he has considered all relevant factors when designating an operator and adequately explain what factors impacted his designation.

must pay the miner's benefits, even if the correct responsible operator can be identified. *Hobet Mining, Inc.*, 156 F.4th at 401 (emphasis added) (if the district director designated the wrong operator, the Black Lung Disability Trust Fund must assume liability for a claim, because "Congress set it up to pay benefits where no operator can be found liable or *made to pay*"); *Three H Coal Co., Inc. v. Dir., Off. of Workers' Comp. Programs*, No. 23-1486, 2025 WL 251333, at *2 n.1 (4th Cir. Jan. 21, 2025) (per curiam) ("If . . . the designated responsible operator prevails at the hearing, the Black Lung Disability Trust Fund assumes liability for the claim"); DOL Commentary at 79,990 ("The Department's final regulations create Trust Fund liability in different circumstances: where the district director's designation of the responsible operator proves to be incorrect."). In designing this remedial mechanism for errors committed by the district director, DOL expressly articulated its belief "that any additional risk of liability imposed on the Trust Fund is acceptable" in service of "eliminat[ing] a major source of delays in the adjudication of claims" where "the district director's designation of the responsible operator proves to be incorrect." DOL Commentary at 79,990, 79,991.

Here, the district director incorrectly named Rhino as the responsible operator, leaving us no choice but to impose liability on the Fund. We do so reluctantly, cognizant of the burden born by the Fund in compensating miners whose health has deteriorated as a result of their backbreaking labor in service of the Nation's energy needs, and whose former employers are no longer financially capable of paying out claims. Indeed, our dissenting colleague accurately describes the importance of the Fund and the financial demands placed upon it. But unfortunately, the law affords us no choice in the matter

28

when, as here, the district director, the ALJ and the Board designated the wrong operator as the one liable to pay the miner's benefits. However, we reiterate that the burden of imposing liability on the Fund in similar cases could be minimized if the district director, who holds the initial burden to designate the correct operator, properly considers all relevant factors under 20 C.F.R. § 725.494 and details the reasons for his designation.

IV.

For the foregoing reasons, we grant Rhino's petition for review, vacate the Board's improper designation of Rhino as the responsible operator and remand to the Board to direct the Black Lung Disability Trust Fund to pay Mr. Rule's benefits.

*PETITION FOR REVIEW GRANTED;*
*ORDER VACATED AND REMANDED*

29

WILKINSON, Circuit Judge, dissenting:

I would deny the petition for review. The district director in the Office of Workers' Compensation Programs ("OWCP") properly designated Robert Rule's penultimate employer, Rhino Energy, LLC, as the "responsible operator" for Rule's Black Lung Benefits Act ("BLBA") claim. This designation triggered a presumption of liability, placing the burden on Rhino to prove the district director should have instead picked Rule's final employer, Wildcat Energy, LLC. Rhino thus needed to show that Wildcat "possesses sufficient assets to secure the payment of benefits." 20 C.F.R. § 725.495(c)(2). Since the record does not demonstrate Wildcat's solvency, Rhino failed to carry its burden.

The majority complicates this open-and-shut case by faulting the district director for not explicitly writing about the status of Wildcat's finances. In doing so, it concludes that the responsibility to pay falls neither on Rhino nor on Wildcat, but on the publicly funded Black Lung Disability Trust Fund ("Trust Fund"). Nowhere do the regulations, let alone the BLBA, permit a presumptively liable employer to escape liability on this basis. And of course, the Trust Fund is already indebted to the tune of $5 billion. The majority only makes a bad situation worse, to the chagrin of Congress and the drafters of the BLBA regulations alike.

I.

Recall the parties' common ground. They agree that Rule is entitled to BLBA benefits due to his total disability from pneumoconiosis. *See* 30 U.S.C. § 922(a)(1). They likewise agree that the Director of the OWCP ("Director") met his initial burden of proving that the district director's "designated responsible operator" for said benefits—Rhino—is

30

a "potentially liable operator." 20 C.F.R. § 725.495(b). This means that Rhino is one of Rule's former employers and can afford to pay his claim. *Id.* § 725.494(c), (e).

That in mind, pick up where the majority leaves off. When a designated responsible operator (Rhino) is let off the hook due to some subsequent employer (Wildcat) being deemed potentially liable, the BLBA regulations ostensibly prohibit us from remanding for the district director to fix his responsible-operator designation. This is because "[t]he district director may not notify additional operators of their potential liability after a case has been referred to the Office of Administrative Law Judges." 20 C.F.R. § 725.407(d). Rather, according to the regulations, liability at that point shifts to the Trust Fund—"even if the actual responsible operator can be identified." *Marfork Coal Co. v. Weis*, 251 F. App'x 229, 231 (4th Cir. 2007). Following this principle, the majority reluctantly admits that its holding means *both* Rhino and Wildcat escape liability for Rule's claim, leaving the Trust Fund with the tab.

Why is this a concern? Well, under the BLBA, the Trust Fund is supposed to come into the picture only in limited circumstances. *See* I.R.C. § 9501(d). Just one bears any semblance of applicability here: "[T]here is no operator who is liable for the payment of [a claimant's] benefits." *Id.* § 9501(d)(1)(B). Yet no one even attempts to argue this provision applies. Rhino concedes it is a potentially liable operator due to its past employment of Rule and its ability to pay his claim. The mere possibility that a later employer like Wildcat may be potentially liable too, as the majority thinks, does not change the fact that there is *some* operator—be it Rhino or Wildcat—liable for Rule's claim. In such a setting, the BLBA does not countenance resorting to the Trust Fund. *Cf. Dir., Off. of Workers' Comp.*

31

*Programs v. Oglebay Norton Co.*, 877 F.2d 1300, 1304 (6th Cir. 1989). After all, Congress enacted strict limits on the Trust Fund's coffers "to ensure that individual coal operators rather than the trust fund bear the liability for claims arising out of such operators' mines, *to the maximum extent feasible*." S. Rep. No. 95-209, at 9 (1977) (emphasis added).

This statutory design makes perfect sense. The Trust Fund effectively serves as a guarantor for coal mining companies, covering benefits when operators cannot pay through their own funds or insurance. *See Lovilia Coal Co. v. Williams*, 143 F.3d 317, 321 (7th Cir. 1998). Accordingly, if a claimant is totally disabled by pneumoconiosis and a former employer can afford his claim, one would intuit that the employer should foot the bill.

Yet the majority creates new opportunities for undeserved windfalls for operators, all to the detriment of the Trust Fund. And that detriment is a serious one. As of September 2024, the Trust Fund is sitting on $5.1 billion of outstanding debt. Dep't of the Treasury, *Treasury Bulletin* 74 tbl. TF-3 (Mar. 2025). It should not have any. Congress established the Trust Fund in tandem with an excise tax on coal sales, which was intended as its primary source of financing. S. Rep. No. 95-209, at 2. In theory, this tax ensures that the coal industry shares the social costs of pneumoconiosis whenever individual coal-mining companies cannot meet their former employees' claims. In other words, it furthers the BLBA's sensible goal of seeking compensation from coal producers and consumers—that is, those most directly responsible for the harms caused by pneumoconiosis.

Recognizing that costs might exceed revenue in any given year, Congress also enabled the Trust Fund to borrow from the Treasury when it faces a deficit. And borrow it has. "Throughout its history, the [Trust Fund] has not raised revenues sufficient to meet

32

obligations and has partially relied on borrowing from the Treasury to pay expenses and benefits." Scott D. Szymendera et al., Cong. Rsch. Serv., R45261, *The Black Lung Program, the Black Lung Disability Trust Fund, and the Excise Tax on Coal* 1 (Feb. 7, 2023). Indeed, these deficits have persisted even after Congress's repeated attempts to render the Trust Fund self-sufficient. Since the Trust Fund's inception, Congress has forgiven $6.5 billion of its debt, restricted miners' eligibility for benefits, enacted a five-year moratorium on the Trust Fund's accrual of interest, increased interest rates charged on operators' liabilities, and more than doubled the tax rate on coal. U.S. Gov't Accountability Off., GAO-18-351, *Black Lung Benefits Program: Options for Improving Trust Fund Finances* 9–10 (2018); *Old Ben Coal Co. v. Luker*, 826 F.2d 688, 693–94 (7th Cir. 1987). All for seeming naught; even after these initiatives, the Department of Labor estimates that the Trust Fund's debt will still be upwards of $13 billion by 2050. U.S. Gov't Accountability Off., GAO-24-107597, *Black Lung Benefits Program: Lack of Resolution on Coal Operator Self-Insurance Increases Financial Risk to Trust Fund* 3 (2024).

The majority nevertheless reasons that its decision strikes the most optimal balance between holding operators accountable and expeditiously facilitating benefits. For example, if a claimant unquestionably deserves benefits but has multiple potentially liable former employers, it would be perverse to require that claimant to endure years of litigation before seeing so much as a dollar in benefits. Make no mistake: I agree. But Congress has already resolved this quandary for us. That is, whenever a chosen operator disagrees with being selected and correspondingly refuses to pay, the Trust Fund can distribute benefits to the claimant on an interim basis until the liable operator (if any) is conclusively

33

determined. *See* I.R.C. § 9501(d)(1)(A)(i); 20 C.F.R. §§ 725.420, 725.522(a). At that point, the correct liable operator both reimburses the Trust Fund (plus interest) for these interim benefits and assumes responsibility for paying all future benefits. 30 U.S.C. § 934(b)(1); *see, e.g.*, *Reich v. Youghiogheny & Ohio Coal Co.*, 66 F.3d 111, 114 (6th Cir. 1995). This is the best of both worlds: the claimant receives his benefits at the same time as he would under the majority's holding, and the Trust Fund can now recoup its initial loss. The majority need not assume that timely benefits and proper assignment of liability are mutually exclusive.

In short, whereas borrowing was intended as a stopgap for small deficits in Trust Fund finances, it quickly became a necessary and unstoppable crutch for the Trust Fund to stay afloat. And the majority only adds to these problems. Despite the district director's proper designation of a potentially liable operator that—by its own admission—can afford Rule's benefits, the Trust Fund must still pay up. In so holding, the majority flips the Trust Fund's role from the payer of last resort to the magnanimous insurer of employers lucky enough to find themselves in Rhino's position. Wholly overlooked is where this result derives from the BLBA or indeed common sense.

## II.

The majority, to its credit, says that it too laments the Trust Fund's plight. Yet it concludes that such a plight is sealed by the BLBA regulations. I disagree. Neither those regulations nor the BLBA itself—which of course trumps its own regulations, *Monsalvo v. Bondi*, 145 S. Ct. 1232, 1243 (2025)—justifies shifting liability away from Rhino.

34

Remember, both parties recognize that Rhino is a "designated responsible operator." As part of this designation, the company is "presumed, in the absence of evidence to the contrary, . . . capable of assuming liability for the payment of benefits." *Id.* § 725.495(b). Resisting this presumption, Rhino contends that Wildcat is Rule's most recent employer that qualifies as a potentially liable operator. If true, this would mean that the district director should have designated Wildcat as the responsible operator and that Rhino cannot be liable. *See id.* § 725.495(a)(1).

Crucially, Rhino "bear[s] the burden of pro[of]" on this issue. *Id.* § 725.495(c). And included in this burden is the requirement that Rhino show Wildcat's financial ability to afford Rule's claim. *Id.* Indeed, the regulations could not make this requirement any more explicit: "In order to establish that a more recent employer is a potentially liable operator, the designated responsible operator must demonstrate that the more recent employer possesses sufficient assets to secure the payment of benefits . . . ." *Id.*

As the Benefits Review Board rightly observed, nothing in the record indicates that Wildcat is solvent. In fact, though Rhino blanketly states in its briefing (as it did below) that Wildcat can afford Rule's benefits, Rhino has never tried to "proffer[] evidence to that effect." J.A. 343 n.8. Given at most a record in equipoise, then, we must decide against the party carrying the burden of proof—again, Rhino.

Against all this, the majority emphasizes that the district director did not comment on Wildcat's ability to pay Rule's benefits. This silence, the argument goes, triggers an exception to a designated responsible operator's burden of proof, shifting it to the Director:

35

> In any case referred to the Office of Administrative Law Judges . . . in which the operator finally designated as responsible . . . is not the operator that most recently employed the miner, the record shall contain a statement from the district director explaining the reasons for such designation. If the reasons include the most recent employer's failure to meet the conditions of § 725.495(e) [(that is, the most recent employer's "[in]capab[ility] of assuming its liability for the payment of continuing benefits")], the record shall also contain a statement that the Office has searched the files it maintains . . . and that the Office has no record of insurance coverage for that employer, or of authorization to self-insure . . . . Such a statement shall be prima facie evidence that the most recent employer is not financially capable of assuming its liability for a claim. *In the absence of such a statement, it shall be presumed that the most recent employer is financially capable of assuming its liability for a claim.*

20 C.F.R. § 725.495(d) (emphasis added). The majority specifically homes in on the last sentence of this regulation. As it sees things, Wildcat must be presumed capable of affording Rule's benefits because the district director did not discuss Wildcat's solvency in writing, let alone specify that he could not find any record of insurance after searching the OWCP's records.

But this interpretation disregards the rest of the subsection. That is, the last sentence of § 725.495(d) concerns a "statement" that the district director makes *only if* his stated justification for holding an earlier employer liable includes the most recent employer's inability to afford the miner's claim. *Id.* Without this justification, the district director need not make the statement altogether. *Id.* And without this obligation to make the statement, we cannot say there was "the absence of such a statement." After all, "absence" refers only to the "failure to be present . . . *where one is needed, wanted, or normally expected.*" *Absence*, Webster's Third New International Dictionary 6 (2002) (emphasis added). For

36

example, one would not say "the New York Yankees were absent from the basketball game at Madison Square Garden." The Bronx Bombers had no business there in the first place.

Coloring the majority's interpretation of § 725.495(d) is its premise that the district director must set forth every reason why a prior employer can be designated the responsible operator. However, § 725.495(d) requires only that "the district director explain[] *the* reasons for such designation." 20 C.F.R. § 725.495(d) (emphasis added). Whereas the majority supplants this phrase's second use of "the" with the word "all," the more natural understanding is that the district director need only give *his* reasons for designating an employer liable, which may not capture every possible reason for so designating. Left unexplained too is why the district director's breach of his alleged duty to be exhaustive should cleanse the operator's subsequent failure to meet its burden of proof. As just explained, when the district director designates an earlier employer responsible for reasons other than the final employer's insolvency, the ordinary meaning of § 725.495(d) requires that the designated operator affirmatively prove that the final employer is solvent. That the district director made an alleged error does not somehow render legally immaterial the designated responsible operator's independent error; the mistakes had nothing to do with each other.

To reiterate, when—as here—the district director designates an earlier employer responsible for reasons other than later employers' insolvencies, the first sentence of § 725.495(d) is all that matters. The narrow burden-shifting provision in the last sentence categorically does not apply. The rub is that Rhino still carries the burden of proof, and it still has not even tried to make the requisite showing that Wildcat can pay Rule's claim.

37

III.

Rule will receive his deserved benefits regardless of our decision here. But having the Trust Fund pay those benefits when it is clear that Rhino, as Rule's liable employer, could do so is damaging to the Black Lung Benefits scheme. By holding that the payments should not be coming from the wallet of a responsible operator, the majority misassigns liability to the Trust Fund, an entity that has long been in dire straits. So at the end of the day, the Treasury—and the American taxpayer by extension—is left holding the bag. Because this is the exact negative externality that the BLBA sought to prevent, I respectfully dissent.